**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 07-60882-CIV-HURLEY**

**GRACE MILLER,**
**plaintiff,**

**vs.**

**THE PRUDENTIAL INSURANCE COMPANY OF AMERICA,**
**defendant.**
**_______________________________/**

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### I. Preface

Plaintiff Grace Miller ("Miller") seeks long term disability benefits under an employee welfare plan governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq*. ("the Plan" or "the Policy"). Her former employer, Home Diagnostics, Inc., sponsored and maintained the Plan, while the defendant, The Prudential Insurance Company of America ("Prudential") insured and administered the Plan pursuant to a group policy.

Prudential paid short term disability (STD) and long term disability (LTD) benefits to Miller for depression from 2002 through 2004 and then terminated the disability benefits under a twenty-four (24) month coverage limitation contained in the Plan for disabilities "due in whole or part to mental illness."

Invoking ERISA jurisdiction, 29 U.S.C. § 1132(a)(1)(B), (c)(1), Miller filed this action seeking judicial review of Prudential's benefits determination, contending that Prudential erroneously applied the mental illness limitation here to exclude coverage after 24 months because

her depression had an organic etiology, namely, a 1998 prior back injury and attendant chronic pain syndrome.

The case is now before the court on Prudential's motion for summary judgment by which it seeks affirmation of its benefits termination and entry of summary judgment in its favor on its counterclaim for restitution of $9423.87, representing an alleged overpayment of benefits due to an interim social security disability award. [DE# 31]. For reasons which follow, the court has determined to grant the motion and enter final summary judgment in favor of Prudential.

## II. Fact Background

In 2000, Miller began working for Home Diagnostics, Inc. as a Technical Services ACD Operator in Plantation, Florida at an annual salary of $18,932.40. The job required extensive amounts of sitting, speaking on the telephone, and using a computer. As a benefit of that employment, Plaintiff was covered under a long term disability plan underwritten by Prudential for Home Diagnostics. Prudential administered the Plan and paid claims covered by it from its general revenues.

On March 18, 2002, plaintiff left her job and promptly submitted claim for short term disability benefits to Prudential. She supported her initial claim with a "group disability insurance employee statement," together with an attending physician's statement from Dr. Clark Dreiliniger, her psychiatrist. Dr. Dreilinger, who previously evaluated plaintiff in connection with a 1998 work-related back injury, described plaintiff's physical condition as status post-back injury with chronic pain, stating that plaintiff was "depressed, isolated, no energy and suicidal from loss of confidence and incapacitation physically." He stated that Miller stopped working due to major depression, describing her symptoms to include depressed mood, irritability, and tearfulness, all of which

disrupted her concentration and work performance. He also noted that she was hospital confined from March 18th through March 24th 2002 due to depression. After reviewing the claim, Prudential approved Miller for STD benefits on the basis of "major recurrent and severe depression."

After a May, 2002 telephone conference with Dr. Dreilinger, who reported that he had "serious questions" about Miller's ability to return to work given her severe depression and chronic pain which was "beating her down," and a claim discussion with RN Mary Ann DeSantis, Prudential approved Miller's claim for LTD on May 28, 2002, effective June 17, 2002.

Thereafter, following internal clinical review of Miller's file by RN Nora Bargfrede, Prudential terminated her LTD benefits on July 30, 2002, effective September 1, 2002. Miller sought reconsideration of this decision, citing her more recent hospitalization for depression with suicidal ideation between July 17 to August 3, 2002 at Atlantic Shores Hospital. In September 2002, she advised Prudential that she continued to treat with psychiatrist Dr. Dreilinger and psychologist Dr. Greg once a month, with increased visits when she was "really bad," and that she was taking prescriptions used to treat major depressive disorder and anxiety disorder [Wellbutrin, Remeron and Ativan].

Prudential determined that the continued severity of Miller's psychological symptoms rendered her eligible for further benefits and accordingly reinstated Miller's LTD benefits on the basis of depression and anxiety. On September 21, 2002, it also reminded her of the pertinent twenty-four (24) month limitation for mental conditions contained in the Policy.

Prudential conducted medical record updates in March, April and November, 2003, revealing that Miller had ongoing suicidal ideation, problems with impaired judgment, insight and impulse control and auditory hallucinations, with her counseling increased to bi-weekly frequency.

The November 2003 diagnosis from Dr. Dreilinger included injuries from accident, status post surgical procedures and severe psychological and environmental problems due to frustration from inability to work.

On February 4, 2004, Prudential terminated plaintiff's LTD benefits, effective June 17, 2004, citing the the twenty-four (24) month limitation in the Policy for disability due to mental illness.

On January 28, 2005, Miller filed her first appeal, asserting an inability to work due to chronic pain. On February 15, 2005, Prudential referred her file to a clinical team for a capacity and clinical review. The nurse reviewer, Linda Campos, RN, filed report on February 25, 2005, noting that Miller had a well-documented history for depression since 2000, while notes regarding her back condition were limited. Nurse Campos did note that plaintiff's treatment history for back pain included prescriptions for Darvocet and Duragesic patches, as well as neurontin and oxycontin, and that Miller "has had increased depression, anxiety and stress which was noted to have been directly related to her physical condition." Nurse Campos then opined, in light of the 1999 lumbar fusion which Miller underwent for her prior back injury, that Miller would be expected to have problems with prolonged sitting and standing, and that she should expect to avoid lifting, pushing, or pulling anything over 20 pounds occasionally, while never lifting, pushing, pulling or carrying anything 50 pounds or more. While problems with prolonged sitting and standing were also expected, Campos suggested that these restrictions could be self-limiting, as Miller could reposition or shift her weight as needed to change pressure points. After further review by Prudential's vocational rehabilitation team, on March 3, 2005, Prudential denied plaintiff's first appeal, finding that Miller could perform her "own occupation" with the restrictions and limitations suggested by Nurse Campos.

On August 26, 2005, Miller filed a second appeal, asserting that her disability was rooted in chronic physical pain, together with a supporting medical report from Dr. Craig Lichtblau, a physical medicine and rehabilitation specialist who performed physical and functional capacity examinations on Miller in July 2005. Dr. Lichtblau reported that Miller "[did] not have the functional capacity to work 4 hours per day at this time," but rather needed to be in a sedentary environment which allowed her to change positions at will, and become supine as needed, with occasional lifting up to 10 pounds or less. He further concluded:

> It is my medical opinion that this patient's present level of incapacitation and her past level of incapacitation are a direct result of her lumbar injury in addition to her severe depression. However, it should be understood that if her major depression is taken out of consideration as a contributing factor, it is my medical opinion that this patient would not be able to pursue gainful employment in any capacity based solely upon her lumbar injury, chronic pain and physical functional deficits.
>
> Furthermore, based solely upon her physical injury and chronic pain, it is my medical opinion that she is not able to pursue gainful employment in any capacity in her occupation as technical services ACD operator. I have reviewed Home Diagnostics, Inc.'s Job Description for a technical services ACD operator and it is my medical opinion this patient is not capable of sitting for prolonged periods of time and is not able to carry or manipulate 10 lbs. on a regular basis. It is my medical opinion that she does not display the cognitive skills, ability to reason, or ability to concentrate due to the side effects of her narcotic analgesics, which are required for management of her chronic severe low back pain.

After receiving this report, Prudential referred Miller's entire file for external paper review to Dr. Phillip Marion, a physical medicine and pain management specialist employed by Reed Review Services. Dr. Marion issued his report on September 22, 2005, acknowledging that plaintiff suffered functional impairment as a result of her 1999 back surgery (lumbar fusion) and residual post- surgical degenerative spine disease. In light of this history he recommended that Miller be permanently restricted to sedentary light duty activities, with maximum lifting not

exceeding 10 pounds and no significant crawling, stooping, crouching, squatting or kneeling. He restricted bending to less than occasionally, and, due to her documented use of narcotic opiate medications, recommended against working at unprotected heights, operating company cars or using any safety sensitive materials or machinery.

On September 23, 2005, Prudential denied plaintiff's second appeal, again citing the 24-month mental illness limitation. It further advised "[a]ccording to the Policy, effective June 17, 2004, in order to remain eligible for additional benefits, Ms. Miller must be unable to perform the material and substantial duties of any gainful occupation, due to conditions not subject to the [mental illness] benefit limitation." Because it found after thorough review that Miller "was physically capable of performing the duties of her regular sedentary occupation," it concluded she was ineligible for further benefits. In addition, Prudential alerted Miller that it intended to seek reimbursement for an LTD benefit overpayment which occurred due to Miller's interim receipt of a retroactive social security award.

On March 28, 2006, plaintiff filed her third appeal together with a supplemental report from Dr. Lichtblau which clarified a number of points raised in his earlier report. At that juncture, Prudential requested updated medical records form all treating physicians and referred Miller's job description for internal "regular occupation" review[1] by its vocational rehabilitation department. Vocational rehabilitation therapist Gregg Schwartzkopf found that plaintiff's regular occupation was closest to the title of "Order Clerk" as defined in the Dictionary of Occupational Titles [ DOT

[1] The Policy defines "regular occupation" as "the occupation you are routinely performing when your disability begins." It further provides "Prudential will look at your occupation as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location."

249.362-026], noting that someone in that regular occupation would be expected to exert force to lift/carry push/pull objects up to 10 pounds occasionally, or up to negligible weight, with a need for frequent use of the upper extremities for reaching, handling or finger items.

Prudential also referred the file for a second external paper review to Dr. L. Neena Madireddi, a physician specializing in physical medicine and rehabilitation. Dr. Madireddi noted ongoing impairment as of June 17, 2001 related to Miller's history of lumbar spinal surgery with evidence of osteophytic ridging at L5--S1, but the absence of any active lumbosacral radiculopathy or neurological deficit. She opined that physical restrictions for Miller would appropriately include include standing or walking for six hours cumulatively; sitting for up to eight hours cumulatively with usual and customary breaks at every two hours, and shifting body position every hour or so; lifting and or carrying up to 20 pounds occasionally, and 10 pounds frequently, with no restrictions on use of upper extremities and reaching and kneeling without restriction.

In response to Prudential's specific inquiry on whether Miller's self- reported chronic pain was supported by or consistent with any objection diagnostic testing and physical examination findings, Madirredi stated that an MRI taken in August, 2001 did not reveal "significant osteoarthritc changes or dysgenic pathology," or "significant nuerofaoraminal stenosis or spinal stenosis," while physical exam did show some tenderness on palpation of lumbar spine without any obvious spasm.[2] She also noted subjective sensory deficits in lower extremities, observing these to be common in individuals who have undergone spinal surgery. Dr. Madirredi concluded that

---

[2]This finding appears to overlook Dr. Lichtblau's report on physical examination which revealed "diffuse and impressive palpable muscle spasm..." with "close correlation between [Miller's] subjective complaints of pain, her limited spinal mobility and flexibility, with her functional ability."

"[o]verall Ms. Miller's self-reported chronic pain condition is not consistent with the diagnostic test findings and clinical exam findings."

Based on Dr. Madirredi's report, Prudential denied Miller's third appeal and demanded reimbursement of an asserted $9,423.87 LTD overpayment pursuant to the following terms of the Policy:

**What Happens if Prudential Overpays Your Claim?**

Prudential has the right to recover any overpayments due to:

- fraud;
- any error Prudential makes in processing a claim; and
- your receipt of deductible sources of income.

This ERISA action ensued.

## III. Discussion

### A. Standard of Review

ERISA does not promulgate standards under which district courts must review an administrator's decision denying benefits. *Firestone Tire & Rubber Co. v Bruch*, 489 U.S. 101, 109, 109 S. Ct. 945, 953, 103 L. Ed.2d 80 (1989). To fill this void, the Supreme Court has established two distinct standards for reviewing an administrator's decision to deny benefits under a plan governed by ERISA. First, where an administrator acts without discretion to determine eligibility or construe the terms of an ERISA governed plan, a court will review the decision to deny a claim *de novo*. *Id.* at 115, 109 S. Ct. at 956. If, on the other hand, the administrator does possess such discretion, then the court reviews the benefit decision under a deferential, i.e. an arbitrary and capricious, standard. *Id*. at 111, 109 S. Ct. at 954. In the latter situation, if the administrator also operates under a conflict of interest, the court must consider that circumstance as 'a factor" in

determining whether there was an abuse of discretion.'" *Id* at 115, 109, S. Ct. at 957.

After *Bruch,* the Eleventh Circuit developed the following six-step analysis intended to guide district courts in reviewing an administrator's decision to deny benefits:

> (1) Apply the *de novo* standard to determine whether the claim administrator's benefits denial decision is wrong. If the decision is correct, end the judicial inquiry and affirm the decision.
>
> (2) If the administrator's decision is "*de novo* wrong," then determine whether the administrator was vested with discretion in reviewing claim. If the administrator had no discretion, end the inquiry and reverse the decision.
>
> (3) If the administrator's decision was "de novo wrong" *and* he was vested with discretion, then determine whether "reasonable" grounds supported the decision (i.e. review the decision under the deferential arbitrary and capricious standard);
>
> (4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision. If reasonable grounds for the administrator's decision do exist, then determine whether administrator operated under a conflict of interest.
>
> (5) If there is no conflict, end the inquiry and affirm the decision.
>
> (6) If there is a conflict, then apply a heightened arbitrary and capricious standard of review in deciding whether to affirm or deny it.

*Williams v BellSouth Telecommn, Inc*., 383 F.3d 1132, 1138 (11th Cir. 2004).

However, the Eleventh Circuit recently recognized that its use of a third standard (step no. 6) – the "heightened arbitrary and capricious standard" - is not required by *Bruch* and indeed was implicitly overruled by the United States Supreme Court in *Metlife v Glenn*, ____ U.S. ____, 128 S. Ct. 2343, ____ L.Ed.2d _____ (June 19, 2008). *See Doyle v Liberty Life Assurance Co of Boston,* ___ F.3d ____, 2008 WL 4272748 (11th Cir. September 18, 2008). *See also White v The Coca-Cola Company*, ___ F.3d ___, 2008 WL 41497906 (11th Cir. September 10, 2008).

In *Glenn*, the Supreme Court reiterated that an ERISA fiduciary's structural conflict of

interest is but one factor to consider in deciding whether the fiduciary abused its discretion, emphasizing that this consideration does not require a change in the standard of review. It also eschewed "special burden of proof rules, or other special procedural or evidentiary rules focused narrowly upon the evaluator/payor conflict" that circuit courts had developed in this context, *id* at 2351, thus implicitly overruling prior Eleventh Circuit precedent imposing a heightened standard of review on benefit determinations made by conflicted administrators. *See Doyle, supra*. [3]

Under *Glenn,* the importance of the conflict factor within the ERISA review paradigm must be assessed on a case specific basis:

> In such instances, any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessarily depending upon the tie-breaking factor or case specific importance. The conflict of interest at issue here, for example, would prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including but not limited to cases where an insurance company administrator has a history of biased claims administration...It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision-making irrespective of whom the inaccuracy benefits.

*Id.* At 2351.

With this backdrop, the court begins its review of Prudential's LTD benefits determination at issue in this case.

[3]In the wake of *Glenn*, the Eleventh Circuit also abandoned the burden- shifting feature of its heightened review standard, recognizing that the burden of proof remains on the claimant to show that the administrator's decision was arbitrary – it does not shift to the administrator to prove a negative, i.e. that its decision was not influenced by a conflict. *See Doyle, supra,* 2008 WL 4272748 * 8.

**B. The Policy**

The Policy contains the following definition of disability:

**How does Prudential Define Disability?**

You are disabled when Prudential determines that:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury.

After 24 months of payments, you are disabled when Prudential determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

The Policy requires satisfactory proof of claim, requiring the claimant to show:

(1) that you are under the regular care of a doctor;
(2) the appropriate documentation of your monthly earnings;
(3) the date your disability began;
(4) appropriate documentation of the disabling disorder;
(5) the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation or gainful occupation;
(6) the name and address of any hospital or institution where you received treatment, including all attending doctors;
(7) the name and address of any doctor you have seen.

In addition, "[Prudential] may request that [the claimant] send proof of continuing disability, satisfactory to Prudential, indicating that [the claimant] [is] under the regular care of a doctor."

Finally, the Policy contains the following relevant benefit limitation:

**Disabilities which, as determined by Prudential, are due in whole or part to mental illness have a limited pay period during your lifetime.**

**The limited pay period for mental illness is 24 months during your lifetime.**

**C. Analysis**

A denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. If the benefit plan gives discretion to an administrator who is operating under a conflict of interest, the conflict is to be weighed as "a factor" in determining whether there is an abuse of discretion, *Firestone Tire & Rubber Co. v Bruch*, 489 U.S. 101, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989), with the burden of proof remaining on the claimant to show that the administrator acted arbitrarily. *Doyle v Liberty Life Assurance Co. Of Boston*, *supra.*

In this case, the Policy gives Prudential some degree of discretion to decide disability claims, [4] therefore requiring application of the arbitrary and capricious standard of review.

Because Prudential admittedly pays those claims from its own assets, it has a conflict of interest. Therefore, following the Eleventh Circuit's six-step paradigm in *Williams*, to the extent not overruled by *Glenn,* the analysis thus begins by asking whether Prudential's termination decision was correct under *de novo* review. If it was wrong, the court then determines whether it was nevertheless reasonable. Finally, if it was wrong but reasonable, this court must consider the impact of the administrator's conflict in deciding whether its decision to terminate benefits was arbitrary

---

[4] The Policy recites that the claimant is disabled "*when Prudential determines*" that the claimant is unable to perform the material and substantial duties of her regular occupation due to sickness or injury, and there is a 20% or more loss in the claimant's indexed monthly earnings due to that sickness or injury. In addition, it confers discretionary authority on Prudential to determine the applicability of the mental illness limitation: "Disability which, *as determined by Prudential*, are due in whole or part to mental illness have a limited pay period during your lifetime." *See e.g. Newell v Prudential Ins. Co. of America*, 904 F.2d 644 (11th Cir. 1996).

under the particular circumstances of the case.

Upon careful review of the administrative record, the court finds, first, that the medical evidence, liberally read, creates a debatable question of fact on whether Miller's disability may have been attributable entirely to an organic or physically based condition, thus removing her claim from the ambit of the mental illness limitation. [5] This fact issue on the etiology of the condition causing the incapacitation precludes a summary determination on the correctness of Prudential's conclusion that Miller was disabled "due in whole or part to mental illness." The court will accordingly assume for summary judgment purposes that Prudential's decision was wrong.

Next, the court must consider whether Prudential acted reasonably, or conversely whether it abused its discretion when it terminated Miller's long term disability benefits under the 24- month mental illness limitation. *See Glazer v Reliance Standard Life Ins. Co.*, 524 F.3d 1241, 1246 (11th Cir. 2008)("When conducting a review of an ERISA benefits denial under an arbitrary and capricious standard (sometimes used interchangeably with an abuse of discretion standard), the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.").

In this case, the record inescapably establishes that plaintiff's initial claim and receipt of disability benefits was due to severe depression. It is also undisputed that she continued to receive treatment for major depression throughout the June 2002- June 2004 period, including hospitalizations for depression and suicidal ideation, ongoing consultations with her psychiatrist and

---

[5] While Dr. Lichtblau opines that Miller's incapacitation is the "direct result of her lumbar injury in addition to her severe depression," he goes on to say that even without major depression in the mix, she "would not be able to pursue gainful employment in any capacity based solely upon her lumbar injury, chronic pain and physical functional deficits."

psychologist, and ongoing use of anti-depressant prescription medications. From this medical predicate, Prudential may logically have deducted that the mental disorder that supported the initial award of short term disability benefits remained a disabling condition for Miller throughout the 24 month period that she received long term disability benefits. A threshold question thus arises as to whether the administrator acted arbitrarily and capriciously in invoking the Policy's twenty-four month "mental illness" limitation at the end of that term, despite the presence of some evidence suggesting the possibility of an organic injury which may have contributed, at least in part, as a cause of her depression.

As noted, the Plan limits coverage for any disability which is "due in whole or part to mental illness." This provision applies to cut off benefits after 24 months in cases where a claimant's disability is attributable solely to a mental condition, and also where a claimant's disability is attributable in part to a physical condition and in part to a disabling mental condition that spanned the entire 24 month period.

However, because the Plan does not define "mental illness" and fails to provide whether illness is properly characterized as "mental" based on its symptoms or based on its etiology, it is necessarily ambiguous, an ambiguity which must be interpreted against the insurer which drafted it. *Billings v UNUM Life Insurance Co. Of America,* 459 F.3d 1088 (11th Cir. 2006). This means that an organic based illness or disease - regardless of its mental manifestations -would fall outside of the mental illness limitation.

In this case, the Policy placed the burden of providing written proof of eligibility for benefits expressly placed on the claimant, and, "where the plan puts the burden on the claimant to prove that she is disabled, it is implicit in the requirement of proof that the evidence be objective." *Watts*

*v BellSouth Telecomms, Inc*., 218 Fed Appx 854 (11th Cir. 2007); *Hufford v Harris Corp*, 322 F Supp2d 1345, 1356 (M.D. Fla. 2004). Thus, the burden was on plaintiff to show by objective evidence that a physically based or organic illness or condition prevented her from performing the duties of her "any occupation" in order to qualify for LTD benefits beyond the 24 month mental illness limitation period.[6] This means that she had the burden to show, by objective evidence, that her mental disorder was entirely organically based, and that it prevented her from performing the duties of *any* occupation after the expiration of the initial 24 months term, *or* that her back injury and associated pain syndrome, standing alone, incapacitated her to such a degree.

It was not unreasonable for Prudential to find she did not meet this burden here. Although there is some evidence here that Miller's depression was at least in part attributable to an organic condition, there is no substantial evidence establishing that her depression was entirely organically based, or that her back injury and associated pain syndrome independently prevented her from performing the functions of "any occupation" for which she was reasonably fitted by education, training or experience

To the contrary, even by accounts of her own experts, Miller's physical and mental condition left her capable of sedentary activity with certain restrictions that would have ]permitted her to perform even the more restrictive job duties defined by her "regular occupation."[7]

---

[6] In order to be entitled to benefits after the expiration of the initial 24 months of disability under the "own occupation" standard, Miller would have to show she is disabled from "any occupation" for reasons unrelated to mental illness.

[7] Dr. Lichtblau opined, per the functional capacity assessment of July 11, 2005, that Miller "objectively demonstrated the functional capacity to participate in her activities of daily living at a sedentary level, lifting no more than 10 lbs or less, infrequently, "while simultaneously expressing the view that she was experiencing severe deficits in a number of mental functions which impeded her ability work.

In short, the Plan required that Miller suffer from a disabling, purely organic or physically based condition (i.e. one which was not caused "in whole or part" by mental illness) in order to avoid the Plan's 24 month limitation for mental illness related disabilities. Because she did not submit substantial evidence which established that she suffered from such a condition, she cannot demonstrate that the administrator abused its discretion by applying the mental illness limitation to her LTD benefits claim.

The only remaining step in the *Williams* analysis is to determine whether Prudential's conflict of interest tainted its decision, thereby rendering its otherwise reasonable decision unreasonable. The record does not contain evidence of malice, self dealing, a parsimonious claims granting history, or other circumstances suggesting a higher likelihood that the structural conflict affected the benefits decision. The court thus assigns the conflict factor a low importance rating, and, finding no other evidence of procedural irregularities or improprieties which might otherwise create an issue of fact on the question of whether Prudential may have been influenced by the conflict, does not find a sufficiently close balance of factors for the conflict to act as a tiebreaker in favor of finding an abuse of discretion. *See e.g. Weakkinen v Unum Life Ins. Co of America*, 531 F.3d 575 (8th Cir. 2008); *Daic v Hawaii Pacific Health Group Plan for Employees of Hawaii Pacific Health*, 2008 WL 3862074 (9th Cir. 2008)(unpub).

Thus, with this conflict factor appropriately weighted, the court concludes that Prudential did not abuse its discretion when it terminated Miller's claim for LTD benefits at the conclusion of

---

Prudential did not abuse its discretion in either extrapolating a physical ability to work with the same restrictions outlined by Dr. Lichtblau over her daily living activities, or in according more weight to the contrary opinions of its own physicians regarding her functional capacities. *Black & Decker Disability Plan v Nord*, 538 U.S. 822, 831, 123 S. Ct. 1965, 1970-72, 155 L.Ed.2d 1034 (2003); *Slomcenski v Citibank, N.A.* 432 F.3d 1271 (11th Cir. 2005).

the 24 month mental illness limitation period.

**D. Conclusion**

It is accordingly **ORDERED AND ADJUDGED**:

1. Prudential's motion for summary judgment on plaintiff's ERISA claim [DE# 31] is **GRANTED**. Pursuant to Rule 58, by separate order of the court final summary judgment shall accordingly enter in favor of defendant The Prudential Insurance Company of America and against the plaintiff Grace Miller.

2. As to Prudential's restitution counter-claim seeking recoupment of an alleged overpayment due to plaintiff's interim receipt of social security disability payments, the plaintiff does not contest that these payments were received nor otherwise demonstrate any basis why the Policy provision for recoupment should not apply. Because the amount of payments received is not definitively established in the current record, however, the court is unable to determine the amount of this liability as a matter of law at this juncture. Ruling upon the defendant's motion for summary judgment on its counterclaim shall accordingly be deferred at this juncture.

3. The court shall the parties leave to submit supplemental proofs on the social security award offset issue as it pertains to Prudential's counterclaim, allowing an additional **TWENTY (20) DAYS** for each side to submit their competing proofs, if any, upon this issue.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 9th day of October, 2008.

Daniel T. K. Hurley
United States District Judge

cc. All counsel



For updated court information, visit unofficial Web site at http://us.geocities.com/uscts